IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-744

No. COA22-97

Filed 15 November 2022

Wake County, No. 19CRS219702

STATE OF NORTH CAROLINA

v.

KWAIN HAWKINS

Appeal by defendant from judgment entered 25 June 2021 by Judge Paul C. Ridgeway in Wake County Superior Court. Heard in the Court of Appeals 19 October 2022.

> *Attorney General Joshua H. Stein, by Special Deputy Attorney General Sherri Horner Lawrence, for the State.*
>
> *Mark Montgomery, for the defendant-appellant.*

TYSON, Judge.

Kwain Hawkins ("Defendant") appeals from the judgment entered upon a jury's verdict for one count of statutory rape of a child fifteen years or younger and two counts of taking indecent liberties with a child. Defendant's appeal is dismissed.

## I. Background

Fifteen-year-old "Anna" walked from the bus stop to her house on 17 October 2019. (Pseudonym used to protect identity of minor, per N.C. R. App. P. 41(b)). She

rode to and from school every day on the bus, which dropped her off about five minutes from her home. Anna had been diagnosed with autism and experienced social anxiety, but is a well-behaved child, who always arrived home promptly between 4:00 and 4:30 p.m.

¶ 3 On 17 October 2019, Anna noticed an older man standing across the street from the bus stop. The man, who was later identified as Defendant, made eye contact with her. Anna attempted to ignore him when crossing the street, and she continued to listen to music through her headphones while walking home.

¶ 4 Defendant approached Anna and walked alongside her. He asked her: how old she was; if she had a boyfriend; if she found him attractive; if she had ever had sex before; and if she smoked. Anna attempted to ignore Defendant and contemplated whether to answer his questions truthfully.

¶ 5 Defendant asked Anna to walk with him to the park. Anna misheard Defendant because of the music playing on her headphones. She thought Defendant had said "parking lot," which was near her home. Anna agreed, hoping Defendant would leave her alone and rationalizing that she could quickly walk home from the parking lot. Defendant then asked to hold her hand. Anna said "no" three times before finally giving in. Anna's mother would later explain to an investigating officer that Anna's social anxiety causes her to avoid "push[ing] back at people because she hates to be mean and prefers to be a people pleaser."

¶ 6     Defendant led Anna to an open area, situated between two apartment buildings, that did not look like a park. Anna and Defendant sat together on a bench for a few minutes before she told Defendant she was going home. Defendant repeatedly asked Anna for a hug before she left, and he refused to accept "no" as an answer.

¶ 7     While hugging her, Defendant instructed Anna to remove her backpack and give him a "proper" hug. Anna complied out of fear. Defendant starting kissing Anna on the lips and demanded for her to return the kiss. Defendant moved his hands towards Anna's pants and "grabbed [her] bottom." He put his hands inside of Anna's pants and "put his fingers inside [her] vagina."

¶ 8     Defendant directed Anna to follow him to a "more private" wooded area behind the apartment buildings. Once they reached the wooded area, Defendant told Anna "to turn around and pull down [her] pants." When Anna asked "why," he repeatedly told her to "bend" over. Anna asked whether Defendant would hurt her if she refused to comply. Eventually, Anna complied with Defendant's demands. Defendant stood behind Anna and penetrated her vagina with his penis. This rape continued until Defendant was startled by a white van that pulled in behind the apartment complex and parked.

¶ 9     Defendant told Anna to follow him, so Anna pulled up her pants and grabbed her backpack. Anna walked behind Defendant because she "felt safer." Defendant

asked Anna for her name and where she lived. Anna gave Defendant a false name because she did not "want him to ever come back." She also pointed in the opposite location of where her house was located because she "wanted to keep [her] family safe."

¶ 10 Anna's grandmother testified Anna had arrived home late and started crying uncontrollably after admitting she had been raped. Anna's grandmother took Anna to Wake Med North Hospital, while Anna's mother contacted law enforcement. Wake Med North transferred Anna to Wake Med's main hospital campus to collect a rape kit.

¶ 11 A scientist in the forensic biology section of the North Carolina Crime Lab later analyzed the rape kit. She determined the male DNA identified on Anna's vaginal swabs matched Defendant's DNA.

¶ 12 While examining Anna's clothing and undergarments, a City-County Bureau of Identification agent observed white residue in the groin area of Anna's underwear. He noticed "brownish colored stains on the inside of the legs of [Anna's] leggings."

¶ 13 Video surveillance from a nearby middle school showed two individuals, matching Anna and Anna's description of her assailant, walking from the bus stop towards Anna's home around 4:00 p.m. on 17 October 2019. One of the investigating officers used this surveillance footage to capture a photograph of Defendant. The officer posted the photograph on an internal Raleigh Police Department website,

which is accessible to all officers and detectives, and instructed officers to "Be On The Lookout" ("BOLO") for the individual shown in the photo.

¶ 14        Two officers, unrelated to the investigation, recognized Defendant from the BOLO post and contacted the officer who had posted the image. Those officers explained they were "about 85 percent [sure] that the suspect [pictured] is Kwain Hawkins" and included Defendant's date of birth.

¶ 15        A Wake County grand jury indicted Defendant with one count of statutory rape of a child fifteen years old or younger and two counts of taking indecent liberties with a child on 9 March 2020. Anna's mother and grandmother corroborated Anna's testimony. The State entered all of the physical and testimonial evidence outlined above at trial.

¶ 16        Defendant attempted to elicit expert testimony from a nurse, Caron Jones ("Jones"), during his case-in-chief. Jones, a registered nurse, was previously specialized as a "family nurse practitioner and a certified nurse midwife," although her certification to practice as a registered nurse and midwife had expired. Jones was not certified as a Sexual Assault Nurse Examiner ("SANE"), and she had not conducted an examination on a rape trauma victim in over twenty years. Before trial, Defendant had sent emails to the State indicating Jones was prepared to testify "with 100 percent certainty [ ] the victim in this case had not been penetrated based on the amount of DNA that was found on her vaginal swabs."

¶ 17    The State filed a motion in *limine* to exclude this testimony because Jones intended to draw a legal conclusion about whether a sexual "penetration" occurred. N.C. Gen. Stat. § 8C-1, Rule 704 (2021). The State conceded at a pre-trial hearing Jones "could testify that there was nothing in the medical examination consistent with sexual abuse," if tendered as an expert witness.

¶ 18    After the *voir dire* of Jones, the trial court found and concluded Jones was only "qualified to describe female anatomy." The trial court would have allowed Jones to testify there were "no findings of physical trauma in the medical records from the examination of [Anna]," but would not allow Jones to link her opinion "to any conjecture as to whether a sexual assault occurred because she d[id] not have a scientific basis for that linkage." Defendant chose not to call Jones to testify purportedly because of the limitations regarding her testimony.

¶ 19    The jury's verdict found Defendant to be guilty on all three charges. Defendant was sentenced as a prior record level IV offender. He received an aggravated sentence of 456 to 607 months. Defendant filed a timely notice of appeal.

## II.    Jurisdiction

¶ 20    Defendant filed a petition for writ of certiorari. He realized after filing his brief that a certificate of service evidencing service of his notice of appeal was missing from the record on appeal. Defendant also realized his notice of appeal omitted the trial court's rulings, both the pretrial ruling on the State's motion in *limine* and the ruling

following the *voir dire* of Jones during trial, regarding the limitations of Jones' expert witness testimony.

¶ 21    Defendant's notice of appeal only discussed the court's ruling on the motion in *limine* regarding the use of the word "rape," along with five other issues, none of which were discussed in neither Defendant's nor the State's briefs. In his list of proposed issues on appeal, Defendant included the "exclusion of testimony from the defendant's expert witness."

¶ 22    Whether a party adheres to the rules governing appellate procedure is a jurisdictional issue. *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 197, 657 S.E.2d 361, 364-65 (2008) ("The appellant's compliance with the jurisdictional rules governing the taking of an appeal is the linchpin that connects the appellate division with the trial division and confers upon the appellate court the authority to act in a particular case.").

¶ 23    "The North Carolina Rules of Appellate Procedure are mandatory and failure to follow these rules will subject an appeal to dismissal." *Viar v. N.C. Dep't of Transp.*, 359 N.C. 400, 401, 610 S.E.2d 360, 360 (2005) (citation and quotation marks omitted).

¶ 24    A criminal defendant may appeal "from a judgment or order of a superior or district court" by:

> (1) giving oral notice of appeal at trial, *or*
>
> (2) filing notice of appeal with the clerk of superior court

> *and serving copies thereof upon all adverse parties* within fourteen days after entry of the judgment or order or within fourteen days after a ruling on a motion for appropriate relief made during the fourteen-day period following entry of the judgment or order.

N.C. R. App. P. 4(a) (emphasis supplied).

When a Defendant provides a written notice of appeal, the notice must also "designate the judgment or order from which appeal is taken and the court to which appeal is taken." N.C. R. App. P. 4(b).

To preserve an issue for appeal, "a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a)(1).

The party invoking appellate jurisdiction must also prepare a list of "[p]roposed issues that the appellant intends to present on appeal . . . without argument at the conclusion of the printed record in a numbered list." N.C. R. App. P. 10(b). This list of proposed issues on appeal "*shall not limit the scope of the issues presented on appeal in an appellant's brief.*" *Id.* (emphasis supplied).

Rule 21 of the North Carolina Rules of Appellate Procedure provides an alternative, although a discretionary and extraordinary basis for parties to obtain appellate jurisdiction. *State v. Grundler*, 251 N.C. 177, 189, 111 S.E.2d 1, 9 (1959) (citations omitted) (explaining a petition for writ of certiorari "must show merit or

that error was probably committed below" and "is a discretionary writ, to be issued only for good and sufficient cause shown"). If a party petitions this court for a writ of certiorari, this Court, wholly within its discretion, may "suspend or vary the requirements or provisions of any of these rules in a case pending before it upon application of a party." N.C. R. App. P. 2.

### A. Certificate of Service Requirement per Rule 4(a) of North Carolina Rules of Appellate Procedure

¶ 29      This Court may issue a writ of certiorari "in appropriate circumstances . . . when the right to prosecute an appeal has been lost by *failure to take timely action*." N.C. R. App. P. 21(a)(1) (emphasis supplied). "Rule 21(a)(1) gives an appellate court the [jurisdictional] authority to review the merits of an appeal by certiorari even if the party has failed to file notice of appeal in a timely manner." *Anderson v. Hollifield*, 345 N.C. 480, 482, 480 S.E.2d 661, 663 (1997).

¶ 30      In *Hale v. Afro-Am. Arts Int'l., Inc.*, this Court "dismissed defendants' appeal after the record on appeal had been served on the appellee and docketed *without objection* in the Court of Appeals and *after all briefs had been duly filed*." 335 N.C. 231, 232, 436 S.E.2d 588, 589 (1993) (*per curiam)* (emphasis supplied). Our state Supreme Court disagreed with this Court's decision.

¶ 31      "[A] party upon whom service of notice of appeal is required may waive the failure of service by not raising the issue by motion or otherwise and by participating

without objection in the appeal, as did the plaintiff here." *Id.* (reversing and remanding the case back to this Court "for consideration on the merits").

¶ 32        Here, the facts are similar to those in *Hale*. While Defendant failed to include a copy of the certificate of service in the record on appeal, the State nevertheless responded to Defendant's brief and filed responsive arguments without objection. *Hale*, 335 N.C. at 232, 436 S.E.2d at 589. The State only noticed the defect in the record *after* Defendant had raised the issue in his petition for writ of certiorari, which was filed over a month after the State submitted its reply brief.

¶ 33        The State has waived their opportunity to raise the failure of service objection "by not raising the issue by motion or otherwise and by participating without objection in the appeal." *Id*. If Defendant's failure to include the certificate of service in the record on appeal was the only jurisdictional defect in his appeal, this Court could review Defendant's appeal per *Hale*. 335 N.C. at 232, 436 S.E.2d at 589.

### B. The "Designate the Judgment or Order" Requirement under Rule 4(b) of North Carolina Rules of Appellate Procedure

¶ 34        Our Supreme Court recently re-affirmed: "A writ of certiorari is not intended as a substitute for a notice of appeal because such a practice would render meaningless the rules governing the time and manner of noticing appeals." *State v. Ricks*, 2021-NCSC-116, ¶ 6, 378 N.C. 737, 741, 862 S.E.2d 835, 839 (2021) (citation and quotation marks omitted).

¶ 35    The Court in *State v. Ricks* reviewed a claim with jurisdictional defects due to a defendant's failure to comply with the North Carolina Rules of Appellate Procedure. *Id.*, ¶ 3-4, 378 N.C. at 739, 862 S.E.2d at 837-38 (citing the reasoning adopted by the dissent in *State v. Ricks*, 271 N.C. App. 348, 843 S.E.2d 652 (2020) (Tyson, J., concurring in the result in part and dissenting in part)).

¶ 36    The defendant in *Ricks* "gave oral notice of appeal from his criminal convictions," but "he made no objection to the imposition of SBM [at trial] and never filed a written notice of appeal of the SBM orders." *Id.*, ¶ 3, 378 N.C. at 739, 862 S.E.2d at 837. The defendant filed "a petition for writ of certiorari seeking review of the SBM orders" after filing the record of appeal. *Id.*

¶ 37    Our Supreme Court held this Court abused its discretion in *Ricks* by invoking Rule 2 to review a constitutional argument the defendant had failed to preserve at trial, which is required by Rule 10. *Id.*, ¶ 5-6, 378 N.C. at 740-41, 862 S.E.2d at 838-39 (noting the defendant also had failed to comply with Rule 3, which is the civil equivalent of Rule 4, by failing to file a written notice of appeal of the SBM issue); N.C. R. App. P. 2, 3, 4, and 10.

¶ 38    "Though the Court of Appeals may issue a writ of certiorari to review a trial court's order 'when the right to prosecute an appeal has been lost by failure to take timely action,' N.C. R. App. P. 21(a)(1), the petition must show 'merit or that error was probably committed below.'" *Id.*, ¶ 6, 378 N.C. at 741, 862 S.E.2d at 839 (citing

*Grundler*, 251 N.C. at 189, 111 S.E.2d at 9).

¶ 39     Here, Defendant's procedural defects differ from the defects present in *Ricks* because Defendant complied with Rule 10. *Id.*, ¶ 5-6, 378 N.C. at 740-41, 862 S.E.2d at 838-39. The issue Defendant asks this Court to review on appeal was preserved at trial in accordance with Rule 10(a)(1). N.C. R. App. P. 10(a)(1) (noting, to preserve an issue on appeal, "a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make" and the party must have "obtain[ed] a ruling").

¶ 40     The trial court ruled on the State's motion in *limine* and its Rule 702 objection at trial. Defendant also included the exclusion of Jones' expert witness testimony in his list of proposed issues on appeal, which is also required by Rule 10(b). N.C. R. App. P. 10(b).

¶ 41     Although Defendant complied with Rule 10, Defendant's appeal still possesses jurisdictional defects because of his failure to comply with Rule 4. *Ricks*, ¶ 6, 378 N.C. at 741, 862 S.E.2d at 839 (citing *Grundler*, 251 N.C. at 189, 111 S.E.2d at 9); N.C. R. App. P. 4 and 10. Defendant's petition for writ of certiorari must assert a showing of "merit or that error was probably committed below." *Id.*

### III.     Restricting Expert Testimony

¶ 42     Defendant purports to raise one issue on appeal: whether the trial court erred by restricting Jones' expert testimony. Defendant argues an expert witness is not

required to cite specific scientific studies to support their opinions when testifying to the characteristics of alleged rape victims.

## A. Standard of Review

"In reviewing trial court decisions relating to the admissibility of expert testimony evidence, this Court has long applied the deferential standard of abuse of discretion. Trial courts enjoy wide latitude and discretion when making a determination about the admissibility of [expert] testimony." *State v. King*, 366 N.C. 68, 75, 733 S.E.2d 535, 539-40 (2012) (citation omitted).

## B. Analysis

Rule 702 of the North Carolina Rules of Evidence governs the admissibility of expert testimony, which provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion, or otherwise, if all of the following apply:
>
> > (1) The testimony is based upon sufficient facts or data.
> >
> > (2) The testimony is the product of reliable principles and methods.
> >
> > (3) The witness has applied the principles and methods reliably to the facts of the case.

N.C. Gen. Stat. § 8C-1, Rule 702 (2021).

¶ 45 The trial court reviews and determines preliminary questions regarding the qualifications of a witness to testify as an expert witness and the admissibility of evidence. N.C. Gen. Stat. § 8C-1, Rule 104(a) (2021); *State v. Goode*, 341 N.C. 513, 527, 461 S.E.2d 631, 639 (1995) (explaining Rule 702 and Rule 104(a) read conjunctively mean that when "a trial court is faced with a proffer of expert testimony, it must determine whether the expert is proposing to testify to scientific, technical, or other specialized knowledge that will assist the trier of fact to determine a fact in issue").

¶ 46 The first prong of Rule 702 focuses on the principles and methodologies an expert utilized or relied upon when reaching their conclusions.

> The subject of an expert's testimony must be "scientific . . . knowledge." The adjective "scientific" implies a grounding in the methods and procedures of science. Similarly, the word "knowledge" connotes more than subjective belief or unsupported speculation.
>
> . . .
>
> [I]n order to qualify as "scientific knowledge," an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., "good grounds," based on what is known. In short, the requirement that an expert's testimony pertain to "scientific knowledge" establishes a standard of evidentiary reliability.

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589-90, 125 L.Ed.2d 469, 480-81 (1993); *see also Pope v. Bridge Broom, Inc.*, 240 N.C. App. 365, 376, 770 S.E.2d 702,

711 (2015) (citations and quotation marks omitted) ("The requirement that expert testimony must be based on scientific knowledge, means that the principles and methods used to form that testimony must be grounded in the scientific method. In other words, the principles and methods must be capable of generating testable hypotheses that are then subjected to the real world crucible of experimentation, falsification/validation, and replication.").

¶ 47        Here, Defendant has failed to show the trial court did not act and rule within the allowable scope of its discretion. The trial court first applied the factors outlined in *Daubert* when determining whether Jones was qualified as an expert, focusing on the absence of reliable principles and methods.

> THE COURT: Okay. I think we're here just simply – I have not really – my question was what studies did she rely on because one of the – you know, three criteria under *Daubert* is the underlying scientific theory must be valid, the technique applying the theory must be valid, and the technique must have been properly applied upon the occasion in question. . . . I was trying to understand what scientific theories was she relying upon in making these conclusions about the lack of physical trauma is inconsistent with a report of a 15-year-old being statutorily raped. And that's – that is the – I was simply asking what scientific data she was relying on.

¶ 48        The trial court also contemplated how to balance Jones' lack of credentials and training with Defendant's right to present a defense.

> THE COURT: All right. This would put the Court in somewhat of a dilemma because, clearly, I have a

> gatekeeping function under Rule 702 of the Rules of Evidence to exclude unqualified expert testimony, and I'll candidly say much of what I heard falls into that category. What I am balancing that against – and normally that's a discretionary call on my part[,] and I would simply exercise my discretion and make that ruling.
>
> What I'm balancing here is there is a constitutional right of the defendant to present a defense, and that's the challenge that I have here is that, in spite of my – in spite of what I've heard regarding the scientific basis or application of that scientific theory to this case, there is a higher burden on making a decision here. What I am – and there's no doubt that Ms. Jones has extensive experience as a nurse-practitioner, a registered nurse, as an administrator in the health field. And certainly not diminishing that, but this case relates to sexual assault examinations in 2019, and that is where the expertise needs to be.
>
> I would permit two opinions. Well, one, yes, I agree with the State that she is qualified to describe female anatomy. The second thing that I would allow her to testify to – and this is a very narrow opinion that she may render. She may tell the jury, if she so believes, that there are – there is – are no findings of physical trauma in the medical records from the examination of the alleged victim in this case.
>
> However, she cannot link that opinion to any conjecture as to whether a sexual assault occurred because she does not have a scientific basis for that linkage.

¶ 49   Defendant has failed to demonstrate anywhere in the record that the trial court was not correctly analyzing and exercising its discretion to answer the preliminary question of whether Jones was qualified to testify as an expert witness, and to determine the allowable range and scope of her testimony. *Goode*, 341 N.C. at

527, 461 S.E.2d at 639. Defendant's argument is without merit.

## IV.     Conclusion

¶ 50        Defendant has failed to show merit or prejudice in his petition for writ of certiorari. Defendant's explanations of his jurisdictional and procedural defects, in the exercise of our discretion, do not warrant this Court's issuance of the writ without a showing of merit or that prejudicial error was probably committed by the trial court. *Ricks*, ¶ 6, 378 N.C. at 741, 862 S.E.2d at 839 (citing *Grundler*, 251 N.C. at 189, 111 S.E.2d at 9).

¶ 51        Defendant has failed to demonstrate anything tending to show the trial court abused its discretion by limiting the expert opinion testimony of Jones. Although Defendant was allowed to call Jones to testify, he failed to call and preserve her testimony or to make a *voir dire* proffer of what scientific evidence her testimony would have relied on. Defendant has failed to show he did not receive a fair trial, free from prejudicial errors he preserved and argued on appeal.

¶ 52        Defendant's petition is denied, and the appeal is dismissed. *It is so ordered.*

DISMISSED

¶          Judges ZACHARY and HAMPSON CONCUR